

# In the
# Missouri Court of Appeals
## Western District

ABDIANA PROPERTIES, INC., ET AL.,

   **Respondents,**

v.

JERRY BENGSTON, ET AL.,

   **Appellants.**

**WD81817**

**OPINION FILED:**

**May 14, 2019**

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable David Michael Byrn, Judge**

**Before Division Two:**
**Thomas N. Chapman, P.J., Mark D. Pfeiffer, and Cynthia L. Martin, JJ.**

Jerry Bengtson (Bengtson), W. Gordon Snyder (Snyder), Heartland Financial Services, LLC (Heartland) and Navigator Investment Services, LLC (Navigator) (collectively "B.S.H.N. Defendants") appeal the order of the Circuit Court of Jackson County denying their motion to compel arbitration of a cause of action brought by Abdiana Properties, Inc. and Abdiana Ice House, Inc. (together "Abdiana"). In Points 1, 3, and 4 of their appeal, the B.S.H.N. Defendants assert that Abdiana entered into a Private Debt Financing Agreement with Stone Development Inc. ("Stone," a separate defendant that is not one of the appellants) and that because Abdiana's claims against the B.S.H.N. Defendants are related to, rely upon, and are intertwined with the

Private Debt Financing Agreement, the B.S.H.N. Defendants are entitled, though non-signatories, to enforce the arbitration clause in said agreement. In Point 2 of their appeal, B.S.H.N. Defendants contend that Abdiana and Defendant Navigator executed a written Consulting Fee Agreement that included an arbitration clause, and that this was enforceable not only by Navigator, but also by the remaining non-signatory B.S.H.N. Defendants (Bengtson, Snyder, and Heartland). We affirm.

**OPINION**

**Factual and Procedural Background**

In April of 2014, Christina and Nicholas Abnos[1], the owners of Abdiana, reached out to Bengtson, the principal of Heartland, with whom they had worked in the past, to discuss obtaining a line of credit to use in property development. Bengtson undertook assisting the Abnoses in obtaining a source of private funding in the amount of $3,500,000. With the Abnoses' approval, Bengtson had Snyder assist him in this task.[2] Through the B.S.H.N. Defendants, Abdiana began communicating with Stone, a secondary market lender based in California. The B.S.H.N. Defendants maintained that they had successfully closed loans with Stone in the past. Defendants then provided Abdiana a "Letter of Commitment" from Stone, which included the terms of the proposed loan, which required that Abdiana pay a $52,500 loan commitment fee, and which provided that Stone would refund the loan commitment fee if it did not fully fund the $3,500,000 credit facility within sixty days.

---

[1] Because both Christina and Nicholas have the same last name we will refer to them individually as Christina and Nicholas. This is solely for clarity; no disrespect is intended.

[2] Bengtson was the principal of both Heartland and Navigator. Snyder, not formally a member of those entities, was participating as a partner of Bengtson for the purpose of facilitating the funding of this transaction.

On May 27, 2014, prior to making any payments to Stone, Christina received an email from Bengtson which included a proposed (but unsigned) Consulting Fee Agreement to be executed by Abdiana (by Managing Member Nicholas Abnos) and Defendant Navigator (by Bengtson, as "Manager Consultant"). Bengtson also provided documentation purporting to show that Stone possessed enough funds to fulfill its role. After receiving this supporting information, Abdiana sent three wire transfers totaling the entire $52,500 loan commitment fee to Verlin Gradney (a separate defendant alleged to be a principal and trustee of Stone). These separate transfers began on May 30, 2014, with a transfer of $31,500; and were completed on June 4, 2014. The proposed Consulting Fee Agreement provided that Navigator would receive a 3% commission on any amounts loaned to Abdiana by any money lending sources introduced by Navigator; and also contained an arbitration provision governing any disputes.

On June 2, 2014, after sending the first wire transfer partly paying the loan commitment fee, Christina replied to Bengtson's email with a proposed Consulting Fee Agreement attached, which had been revised and signed by Christina as Managing Member of Abdiana. Christina had crossed out an indemnification provision in the proposed Consulting Fee Agreement, and noted that this provision was intentionally deleted. Neither Bengtson, nor anyone else, signed the revised Consulting Fee Agreement on behalf of Navigator or the other B.S.H.N. Defendants.

Abdiana and Stone later executed a Private Debt Financing Agreement, which purportedly included an arbitration provision. The Private Debt Financing Agreement was not included with the motion to compel arbitration and does not appear to have been provided to the circuit court, and is not included in our legal file.

In September of 2015, after repeated requests to be provided the loan funding or have their loan commitment fee reimbursed, Abdiana was informed, during a conference call with Bengtson and representatives of Stone, that Stone was unable to fund the credit facility and was unable to refund the $52,500.

Abdiana filed the underlying action on May 6, 2016, and their First Amended Verified Petition for Damages on June 2, 2017. Abdiana brought claims for fraudulent misrepresentation, negligent misrepresentation, and civil conspiracy against the B.S.H.N. Defendants (the Appellants), and also against Stone, Gradney, and others. Abdiana also brought a count of professional negligence against Bengtson, Snyder, and Heartland; a breach of contract claim against Stone; and a claim for conversion against Gradney. The B.S.H.N. Defendants filed a motion to compel arbitration on January 22, 2018, which was denied by the trial court in its written order filed on May 29, 2018. This appeal followed.

**Standard of Review**

"The issue of whether arbitration should be compelled is a question of law subject to *de novo* review." *State ex rel. Alst v. Harrell*, 528 S.W.3d 442, 445 (Mo. App. W.D. 2017) (quoting *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 774 (Mo. banc 2014)). The parties do not dispute that the underlying case involves parties from separate states and that "[t]he Federal Arbitration Act ('FAA'), 9 U.S.C. § 1 *et seq*. (2006), governs the applicability and enforceability of arbitration agreements in all contracts involving interstate commerce." *Id*. at 446 (quoting *Eaton v. CMH Homes, Inc.*, 461 S.W.3d 426, 431 (Mo. banc 2015)). Although we defer to the FAA where it is in tension with Missouri law, "Missouri contract law applies to determine whether the parties have entered a valid agreement to arbitrate." *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 856 (Mo. banc 2006). Our review of a court's interpretation of an arbitration

4

provision is a matter of law that we review de novo. *Id.* "The party asserting the existence of a valid and enforceable contract to arbitrate bears the burden of proving that proposition." *Kohner Properties, Inc. v. SPCP Group VI, LLC*, 408 S.W.3d 336, 342 (Mo. App. E.D. 2013).

### Analysis

Before addressing the question of whether a valid agreement to arbitrate exists, we first examine whether the agreements at issue are properly before this Court. We note that "[e]xhibits attached to motions filed with the trial court are not evidence and are not self-proving." *Bertocci v. Thoroughbred Ford, Inc.*, 530 S.W.3d 543, 551 (Mo. App. W.D. 2017) (quoting *Ryan v. Raytown Dodge Co.*, 296 S.W.3d 471, 473 (Mo. App. W.D. 2009)). Here the B.S.H.N. Defendants did not request oral argument or a hearing on their Motion to Compel Arbitration; and their Motion was not supported by affidavits.[3] The circuit court did not hold a hearing on the Motion and thus neither of the purported agreements were offered into evidence. Observing that exhibits included in a motion to compel arbitration are not self-proving, the *Ryan* Court indicated:

> Local Rule 33.5 of the Sixteenth Judicial Circuit provides that a party filing any motion shall serve and file at the same time suggestions and any affidavits to be considered in support of the motion…. [A]n appellate court cannot accept counsels' statements as a substitute for record proof even if there is no reason to doubt their accuracy.

296 S.W.3d at 473. In *Ryan*, the appellant's failure to prove (through a hearing, affidavit, or other method) that the purported arbitration agreement attached to its motion was the actual

---

[3] We do note that the B.S.H.N. Defendants in their Reply to Abdiana's Suggestions in Opposition to Their Motion to Compel do state that "Should this Court question whether an enforceable agreement exists between teh [sic] parties mandating arbitration, Defendants seek leave of Court to present additional evidence at hearing to this Court demonstrating mutual assent and the existence of a binding contract. Defendants respectfully request an evidentiary hearing."

5

contract between the two parties was fatal to its claims on appeal. *Id*.

Here, the B.S.H.N. Defendants did provide a Request for Admissions which confirmed that the Consulting Fee Agreement is an accurate copy of the agreement that is being contested. A request for admissions may be used to establish the validity of an exhibit. *AJM Packaging Corp. v. Crossland Const. Co.*, 962 S.W.2d 906, 910 (Mo. App. S.D. 1998). Therefore, the record is sufficient to consider whether the B.S.H.N. Defendants are entitled to compel arbitration under the terms of the Consulting Fee Agreement.

However, the B.S.H.N. Defendants' Request for Admissions did not establish the authenticity of the Private Debt Financing Agreement and they did not attach a copy of that agreement (verified or otherwise) to their Motion to Compel Arbitration. Consequently, it would be appropriate to decline to review Appellants' claim that they are entitled to rely upon the Private Debt Financing Agreement to compel arbitration. Because Appellants did include a request for a hearing in their reply suggestions, and because they also offered to provide the contract for in camera review by the trial court, we will, in the interest of judicial economy, consider enforcement of the purported arbitration clause included in the Private Debt Financing Agreement.

"Absent a contract to arbitrate, no party has a unilateral right to impose on another party a requirement of arbitration as the sole procedure for dispute resolution." *Morrow v. Hallmark Cards, Inc.*, 273 S.W.3d 15, 21 (Mo. App. W.D. 2008). We must determine whether there is a valid agreement to arbitrate Abdiana's claims against the B.S.H.N. Defendants. As noted above, when determining whether the parties in this case are bound by such an agreement our analysis is governed by Missouri law. *Id*. ("Missouri substantive law governs the issues of the existence,

6

validity, and enforceability of any purported arbitration contract. '[I]n determining whether the parties have entered into a valid agreement to arbitrate, the usual rules of state contract law and canons of contract interpretation apply.'") (internal citations omitted) (quoting *Triarch Indus., Inc. v. Crabtree,* 158 S.W.3d 772, 776 (Mo. banc 2005)).

"A mutual agreement is reached when 'the minds of the contracting parties [ ] meet upon and assent to the same thing in the same sense at the same time.' A meeting of the minds occurs when there is a definite offer and an *unequivocal accepta*nce." *Grant v. Sears*, 379 S.W. 3d 905, 916 (Mo. App. W.D. 2012) (internal citation and quotation marks omitted) (quoting *Kunzie v. Jack–in–the–Box, Inc*., 330 S.W.3d 476, 483-84 (Mo. App. E.D. 2010)). Furthermore, "[i]t is axiomatic that a proposal to enter into a bilateral agreement must be accepted by **both** parties for a contract to be formed." *Baier v. Darden Restaurants*, 420 S.W.3d 733, 738 (Mo. App. W.D. 2014). "Silence generally cannot be translated into acceptance." *Kunzie*, 330 S.W.3d at 484 (quoting *Guidry v. Charter Commc'n*, 269 S.W.3d 520, 528 (Mo. App. E.D. 2008)). "Whether a party has accepted the terms of a contract in the absence of a signature is thus a question of fact." *Baier*, 420 S.W.3d at 738. As the party advocating the enforcement of the agreement, the B.S.H.N. Defendants bear the burden of establishing that the contract was formed. *Kohner*, 408 S.W.3d at 342.

We first address Point 2 of the B.S.H.N. Defendants' appeal, which indicates that the trial court erred in failing to enforce the arbitration clause included in the Consulting Fee Agreement

which they proposed (but did not sign). [4]

In *Baier, supra,* an employer sought to enforce an arbitration agreement where the employee had signed the agreement, but the space for the manager's signature went unsigned by the owner of the company, Darden. *Baier,* 420 S.W.3d at 738. Darden argued that the agreement represented an offer that was accepted by Baier when she signed it. *Id*. at 739. Darden claimed that he intended to be bound by the agreement. *Id*. On appeal, this Court upheld the order of the trial court denying the motion to compel arbitration:

> The First Acknowledgment contains a "Management Signature" line that Darden did not sign. The Defendants offered no explanation for the absence of Darden's signature on the First Acknowledgement. The trial court could reasonably have believed that inclusion of a line for "Management Signature" on the First Acknowledgement reflected Darden's intent that its signature be affixed as a condition of mutual assent. In fact, we are hard pressed to discern any purpose for placing a signature line for Darden on the First Acknowledgement unless it was to require an authorized signature as a condition of mutual assent.

*Id*.

As in *Baier*, the Consulting Fee Agreement prepared by the B.S.H.N. Defendants in the instant action included a signature line for Manager Consultant Bengtson. As in *Baier*, it is likewise reasonable to conclude that Bengtson's signature was intended as a condition of the

---

[4] Appellants' second point on appeal asserts the legal conclusion that "[t]he Trial Court erred in denying Appellants' Motion to Compel Arbitration because Respondents and Appellants were parties to an enforceable contract requiring arbitration of these disputes." This point does not accurately identify the claim of error and preserves nothing for review. *Crawford County Concerned Citizens v. Missouri Dept. of Nat. Res*., 51 S.W.3d 904, 908 (Mo. App. W.D. 2001). As that case explains:

> While the appellant in its point relied on does identify the ruling it is challenging and in general terms the legal reasons for the claim of reversible error, it fails to sufficiently "explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error," as required by Rule 84.04(d)(1)(C). Thus, it is nothing more than an abstract statement of law, which fails to satisfy the requirements of the rule as to a proper point relied on. Rule 84.04(d)(4). A point relied on which does not state why the legal reasons support the claim of reversible error, but instead sets out an abstract statement of law, is deficient and preserves nothing for appeal.

Because we can determine the actual claim of error and the basis for it in the argument, we review *ex gratia*.

B.S.H.N. Defendants' mutual assent. *Id*. *See also Stephens v. Brekke*, 977 S.W.2d 87, 93 (Mo. App. S.D. 1998) (finding that when a party did not execute a document in the form they received it there was either no contract or a rejection and a counter proposal.).

The B.S.H.N. Defendants do not directly challenge the trial court's conclusion that Christina's material alteration of the proposed Consulting Fee Agreement constituted a counteroffer; and do not dispute that neither Bengtson nor any of the other B.S.H.N. Defendants ever signed the Consulting Fee Agreement (either in its original form or the counteroffer tendered by Abdiana). The B.S.H.N. Defendants instead argue that they manifested their intention to be bound by the agreement by Bengtson's performance. They also argue that Abdiana's acceptance of Bengtson's performance bound Abdiana to the terms of the Consulting Fee Agreement. Appellants cite a number of cases for the general proposition that a party can be bound to a contract by accepting the performance of the other and by signaling that they intend to be bound by its terms. *See Grant*, 379 S.W.3d at 917; *Heritage Roofing, LLC v. Fischer*, 164 S.W.3d 128, 134 (Mo. App. E.D. 2005); *HDH Development and Realty Corp. v. Smith*, 717 S.W.2d 274, 277 (Mo. App. E.D. 1986).

The B.S.H.N. Defendants contend that they demonstrated their acceptance of Abdiana's counteroffer by their conduct. In particular, they allege Bengtson's performance (reaching out to Stone and seeking to arrange the financing with Stone) as conduct manifesting their intent to be bound by the terms of the Consulting Fee Agreement; and likewise, that Abdiana's acceptance of that performance manifested their intent to be bound by the agreement. However, this ignores the fact that Appellants served in that capacity and worked out the Letter of Commitment from Stone for weeks *prior* to sending Abdiana the Consulting Fee Agreement. In fact, it was the assurances they provided while serving in this role that Abdiana alleges convinced it to wire

9

thousands of dollars to Stone *before* signing the counteroffer Consulting Fee Agreement. Appellants cannot rely on their conduct signaling their acceptance when they were acting in that capacity prior to receiving the amended Consulting Fee Agreement.

The B.S.H.N. Defendants maintain, without specific citation or explanation, that "Respondents' First Amended Verified Petition provides a clear indication that the Consulting Fee Agreement was considered an enforceable agreement between Respondents and Appellants." Appellants also contend that Abdiana admitted entering into the Consulting Fee Agreement and admitted that the Consulting Fee Agreement was enforceable. While Appellants provide a citation to the record for these assertions, our examination of the record reveals no support for the assertion that Abdiana conceded the Consulting Fee Agreement was enforceable.[5]

Point 2 is denied.

In points 1, 3, and 4, the B.S.H.N. Defendants contend that arbitration is required because, even though they are not parties to the Private Debt Financing Agreement (entered into between Abdiana and Stone), they are nevertheless entitled to enforce its arbitration clause.[6]

In Point 1, they assert that a non-signatory may compel arbitration "when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory." *CD Partners, LLC v. Grizzle*, 424

---

[5] In their petition Plaintiffs acknowledge signing the Consulting Fee Agreement, but do not indicate it was enforceable, and do not make contractual claims seeking its enforcement. In response to the B.S.H.N. Defendants' Request for Admissions, Abdiana acknowledged that Christina Abnos modified and signed the Consulting Fee Agreement, but stated it was among several documents "which provide[d] evidence of the 'consulting agreement' among Plaintiffs and Defendants."

[6] In Point 1, the Defendants Snyder, Heartland, and Navigator, also assert, that, as non-signatories, they were nevertheless entitled to enforce the arbitration clause in the Consulting Fee Agreement. Because we find that the Agreement is not enforceable with respect to any of the B.S.H.N. Defendants, their claim, with respect to the enforcement of the arbitration clause in Point 1, as non-signatories, is likewise denied.

10

F.3d 795, 798 (8th Cir. 2005) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)). Or, as the Missouri Supreme Court has noted, a non-signatory may be able to compel arbitration against a signatory to an agreement when "the very basis of the claim against the non-signatory was that it had breached duties and responsibilities purportedly assigned it by the agreement." *Netco, Inc. v. Dunn*, 194 S.W.3d 353, 361 (Mo. banc 2006). While Appellants accurately recite the general state of the law, they fail to explain how it applies in this matter. In fact, they fail to include the Private Debt Financing Agreement between Stone and Abdiana in their record before the circuit court or in this appeal. The acts of Bengtson (inducing Abdiana's payments and in securing Stone's Letter of Commitment) which form the basis of their claims against the B.S.H.N. Defendants occurred *before* Abdiana entered into the Private Debt Financing Agreement with Stone. Abdiana makes no reference to the Private Debt Financing Agreement in their Amended Petition, and none of their claims against the B.S.H.N. Defendants are derived from its enforcement. Abdiana does not rely on the terms of the Private Debt Financing Agreement in asserting its claims against the nonsignatory B.S.H.N. Defendants. The B.S.H.N. Defendants are not entitled to enforce its arbitration clause on that basis. *Netco, Inc.,* 194 S.W.3d at 361.

Point 1 is denied.

In point 3 of their appeal, the B.S.H.N. Defendants argue they are entitled to enforce the arbitration clause of the Private Debt Financing Agreement, because Abdiana's Amended Petition refers "to Stone Development, Inc., a signatory to the arbitration agreement, and Appellants collectively as Defendants and ascribe their acts collectively." Missouri does permit a non-signatory to an agreement to enforce that agreement where a plaintiff "'made allegations which treat all these parties [signatories and non-signatories] as though they were signatories to the

11

agreements.'" *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 814 (Mo. banc. 2015) (quoting *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 728 (8th Cir. 2001). Enforcement is appropriate if a petition "makes no differentiation between the signatory and non-signatory defendants." *Id*. at 815. We will not permit a plaintiff to treat "defendants severally for arbitration purposes but jointly for all other purposes." *Id*.

The B.S.H.N. Defendants fail to explain how this principle applies in the case at hand. They cite Counts I and IV of Abdiana's Amended Petition, which include claims of fraudulent misrepresentation and civil conspiracy against all defendants; but ignore the allegations throughout the Amended Petition that differentiate the various and separate roles the defendants played in conspiring to perpetrate the alleged fraud. The Amended Petition includes a separate count against Stone individually (regarding its breach of contract respecting the Letter of Commitment), two separate counts against Gradney individually (for conversion and constructive trust), and a separate count against the B.S.H.N. Defendants only (for negligence). The various claims brought against the defendants in this case are not treated as "a single one that should be referred in its entirety to arbitration." *Id*. The B.S.H.N. Defendants cite no instances where Abdiana "treat[ed] all…parties [particularly the B.S.H.N. Defendants] as though they were signatories to…agreements," which included an arbitration clause. *Id.* at 814.

Point 3 is denied.

In their fourth point on appeal, Appellants contend that they are entitled to enforce the arbitration provision in the Private Debt Financing Agreement because they are "'sufficiently close [to Stone] that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided.'" *CD Partners*, 424

12

F.3d at 798.[7] Notwithstanding that this argument presumes the validity of an agreement that is not in the record, Appellants' reliance on this case law is misplaced. While Appellants relate at length their connections to Stone, the type of relationship they describe is factually distinct in material ways from the cases they cite. For example, in *Nitro Distrib., CD Partners*, and *Kohner*, the non-signatories to the agreement containing the arbitration agreement were members, officers, or agents of the entity that was a party to the arbitration agreement. *Nitro Distrib., Inc. v. Dunn*, 194 S.W. 3d 339, 349-51 (Mo. banc 2006) (non-signatories seeking to compel arbitration were sufficiently close since they were members of entity which was party to arbitration agreement); *CD Partners*, 424 F.3d at 797, 797-99 (relationship was "sufficiently close" where the non-signatory defendants were the "primary management" of the defendant corporation entitled to assert the arbitration agreement and tort allegations against the non-signatory defendants arose out of their conduct in that capacity); *Kohner*, 408 S.W.3d at 345 (the relationship was of sufficient closeness when "the same individual…[was] acting on behalf of practically every signatory and nonsignatory involved.").

None of the B.S.H.N. Defendants were alleged to be employees, agents, or directors of Stone.[8] Appellants relate their longstanding relationship with both Abdiana and Stone, and indicate they were the primary point of contact between Abdiana and Stone. However, they fail to cite any authority that holds that this would establish a sufficiently close relationship, as would entitle them to enforce an arbitration agreement between Abdiana and Stone.

---

[7] Appellants also cite to *Kohner*, 408 S.W.3d at 345 and *Nitro Distrib.*, 194 S.W.3d at 350.

[8] The B.S.H.N. Defendants assert in conclusory fashion that, at pages 7-9 of the Amended Petition, Abdiana alleges an agency relationship between Stone and the B.S.H.N. Defendants. Abdiana's Amended Petition made no assertion that the B.S.H.N. Defendants were able to bind Stone, and does not allege that Stone required Abdiana deal solely through the B.H.S.N. Defendants. Any such purported agency (between Stone and the B.S.H.N. Defendants) would have been inconsistent with the B.H.S.N. Defendants' role in consulting Abdiana.

Point 4 is denied.

## Conclusion

We find that no valid arbitration agreement existed between the B.S.H.N. Defendants and Abdiana.  The order denying the Motion to Compel Arbitration is, therefore, affirmed.

/s/ *Thomas N. Chapman*
Thomas N. Chapman, Presiding Judge

All concur.